# Commonwealth v. Upper Main Line Bank, Paoli

*P. Richard Klein*, Special Deputy Attorney General, and with him *Walter E. Alessandroni*, Attorney General, for Commonwealth.

*Fred T. Cadmus, III*, and *David C. Patten*, for respondent.

GAWTHROP, P.J., July 9, 1965.—The Commonwealth of Pennsylvania, acting through the Attorney General, has filed a petition for payment into the State Treasury, without escheat, of certain money in the possession of Upper Main Line Bank alleged to be escheatable, specifically pursuant to the Act of April 17, 1869, P. L. 71, sec. 3, 27 PS §332, and the Act of June 7, 1915,

P. L. 878, sec. 7, as amended by the Act of May 16, 1935, P. L. 195, sec. 1, 27 PS §282, asserting that under the authority of the Act of May 16, 1919, P. L. 177, sec. 1, as amended by the Act of April 21, 1921, P. L. 211, sec. 1, 27 PS §431, as reenacted by The Fiscal Code of April 9, 1929, P. L. 343, sec. 1310, 72 PS §1310, such payment over to the credit of the Commonwealth without escheat, subject to being refunded on petition to the Board of Finance and Revenue, should be ordered. Respondent bank filed an answer averring that, pursuant to agreement between the Commonwealth and counsel for Jack E. McCartney, it holds the money merely as stakeholder.

By order entered upon stipulation of counsel for the Commonwealth, for respondent bank and for Jack E. McCartney and Louis DiPrinzio, claimants of the money, the latter were permitted to intervene. They thereafter filed an answer to the petition alleging their joint ownership of the money as finders thereof, denying its delivery to respondent in escrow, alleging that it was left with respondent merely for the purpose of having the mutilated currency exchanged for new currency, denying that the money is escheatable and praying the court to find that they are entitled to it. After appointment of a guardian to represent the interests of DiPrinzio, a minor, a hearing was held and, after argument, the matter is before us for decision.

From the evidence, the following facts appear. On July 17, 1963, Jack McCartney and Louis DiPrinzio, employes of William H. Murray, Inc., an electrical contractor, were leaving the Crossroads Tavern after making a service call and were about to enter Pennsylvania Route 202 when McCartney saw what he thought was a dollar bill lying in the gutter. McCartney got out of his vehicle and picked up what proved to be a roll of mutilated paper currency. The money, entirely in denominations of $50 and $100 bills, was

wet, soggy and faded in appearance. The bills were folded in half and stuck together, with the inside bills in less mutilated condition than those outside. McCartney and DiPrinzio returned to their employer's office and asked him whether it was possible for them to exchange the money for new bills. He recommended that they take the money to respondent bank, which they did.

At the bank the money was shown to Claire Hughes, its vice president, for the purpose of having the money exchanged for new currency. Hughes had McCartney sign an affidavit stating where he found the money and the date it was found, and told McCartney that the money would be sent to Washington, D. C., and if no claim on it was made, he would get it back.

The bank, after receiving clearance from local police authorities and the Federal Bureau of Investigation, forwarded the money, which amounted to $5,000, together with the affidavit to the currency redemption division of the United States Treasury Department on August 13, 1963. The bank never issued and McCartney and DiPrinzio never received a receipt or deposit slip for the money nor did the bank make any bookkeeping entries with respect to it. The bank's purpose in receiving the money was to exchange it for new currency which was to be turned over to McCartney and DiPrinzio.

On September 28, 1964, the United States Treasury Department returned the money to the Upper Main Line Bank by check in the amount of $5,000 made payable to the bank, and the money has since been held by the bank pending outcome of the instant proceeding.

The facts that the property involved is money, together with its manner of folding, its physical condition and all the circumstances of its being found along the edge of a heavily traveled public highway near the entrance driveway into a tavern, convince us that the

money was lost rather than abandoned. From early times it has been the law of Pennsylvania that money found in a public or semipublic place such as the common room of an inn or the floor of a shop is lost, rather than abandoned, property and no presumption of ownership arises even as to the innkeeper or shopkeeper in the absence of evidence pointing to its loss by a guest or patron, so that the general common-law rule that a finder has a valid claim against all the world except the true owner will apply: Hamaker v. Blanchard, 90 Pa. 377. The rule was recognized in Warren, Admr. v. Ulrich, 130 Pa. 413, and in Batteiger v. Pennsylvania Company, 64 Pa. Superior Ct. 195, which, like the Hamaker case, recognized that the place where property is found does not change the rule but may be material in determining whether the article has been lost, rather than merely mislaid. The same rule was recognized in Roberson v. Ellis, 58 Ore. 219, 114 Pac. 100, citing Hamaker, supra, and in Erickson v. Sinykin, 223 Minn. 232, 26 N. W. 2d 172, in both of which it was said: "If it is really lost property which has become separated from the possession of the true owner without his knowledge, . . . it becomes the property of the finder, as against everyone but the true owner." Rogers Appeal, 361 Pa. 51, at page 59, recognized the "finder's qualified ownership," citing Warren, supra, although in the peculiar circumstances of that case the finder disclaimed a finder's right in favor of claiming an informer's fee in escheat.

Intervenors strongly urge that the evidence establishes an abandonment of the money. But to establish abandonment there must be an actual and *voluntary* relinquishment of possession and ownership whereby the property involved ceases to be the property of any person and becomes the subject of appropriation of the first taker: 30 P. L. Encyc., Property, §21, page 26. "Abandonment is to be determined from a consider-

ation of the property and the conduct of a person in relation to it": Fidelity-Philadelphia Trust Co., Excr. v. Lehigh Valley Coal Co., 294 Pa. 47, at 63. "If the property is purposely abandoned by the original owner thereof, it is restored to the common stock, and afterwards becomes the property of the one who first discovers and takes it into his possession": Roberson, supra, 114 Pac. at 102; Erickson, supra, 26 N. W. 2d at 177.

It is strongly argued that when $5,000 in cash is dropped in a roadside gutter where it remains for an undetermined period before being discovered and appropriated, and where, as here, no report of its disappearance is made by the true owner to the local or State police, or to the FBI or to anyone for more than one month, and where for all that appears there is no publication of notice of the loss, the true owner, for reasons sufficient to himself, has not only relinquished possession and ownership but has done so voluntarily, thus establishing an abandonment. But an intent to abandon need not have occurred contemporaneously with the loss of the money. In fact, it may have occurred either then or at some undetermined time thereafter upon later discovery of the money's disappearance, and in the latter event, that time may have been either before or after the finding and appropriation of the money by intervenors. Since voluntary, i.e., intentional, relinquishment must have occurred at some time to establish abandonment, then in the total absence of evidence as to how, when, from whose possession and under what circumstances the money was cast into the gutter, or of the time when, if ever, the true owner formed the intent to relinquish claim to, or ownership in, the money with relation to the time it was found, a necessary element is missing. Because that intention may have occurred, if at all, equally as well after as before the finding, we must conclude that

abandonment is not established and that the money was merely lost. Therefore, no absolute ownership of the money arose in the intervenors. Their evidence established merely their qualified ownership as finders of lost property.

Escheat in Pennsylvania is said to depend on positive statute (Wallace v. Harmstad, 44 Pa. 492, at 501), and generally is not favored by the law: 30 C.J.S. 1165, §2; 19 Am. Jur. 386, §14. Section 58 of The Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §558, requires that the Acts of 1869 and 1915, as amended, being in derogation of the common law, be strictly construed and that any doubt whether property is subject to escheat be resolved against the Commonwealth: Murdock v. John B. Stetson Co., 32 D. & C. 2d 300. By the terms of the Act of May 16, 1919, P. L. 177, sec. 1, as amended, 27 PS §431, and as reenacted in The Fiscal Code of April 9, 1929, P. L. 343, sec. 1310, 72 PS §1310 (see Stahl, Attorney General v. Insurance Company of North America, 408 Pa. 483), only those items of money or property "which are or shall be made escheatable by any act of the General Assembly" are the proper subject of such a proceeding as is now before us, and only such property is payable into the State Treasury without escheat.

There is no doubt of the Commonwealth's right by proper legislative action to provide for escheat of property of unknown owners as a valid exercise of the police power: Philadelphia Electric Company, 352 Pa. 457; Germantown Trust Co. v. Powell, 265 Pa. 71.

By the Act of April 17, 1869, P. L. 71, sec. 3, 27 PS §332 it is provided:

"Whenever any *trustee*, bailee or *other depositary* is or shall be seized or possessed of property, real, personal or mixed, *as a fiduciary agent*, which property is *without a rightful owner*, the same shall escheat to the Commonwealth, subject to all legal demands on the same." (Italics supplied.)

By the Act of June 7, 1915, P. L. 878, sec. 7, as amended, 27 PS §282 it is provided:

"After the *owner*, beneficial owner or *person entitled* to any of the following named moneys or property *shall be and remain unknown*, or the whereabouts thereof shall have been unknown, for the period of seven successive years, such moneys or property shall be escheatable to the Commonwealth, and shall be escheated in the manner hereinafter provided, with interest actually accrued thereon to the date of the decree for the escheat of the same, namely:

"(a) Moneys or other estate of any kind whatsoever held by any person, bank, national bank, trust company, or other association, or corporation, as guardian, committee, executor, administrator, assignee or receiver, or as trustee under or by reason of a dry trust or under or by reason of any other trust the active duties of which have terminated except the delivery or payment to the beneficiaries thereunder of the subject of the trust, and any increments accrued thereon.

"(b) . . . .

"After any moneys or property held by any person, bank, national bank, trust company or other corporation, or by any association, limited partnership, or copartnership, belonging to any other person, the escheat of which is not otherwise provided for in this section, has been and remained unclaimed, by the person for whom the same is held, for the period of seven or more successive years, such moneys or property shall be escheatable to the Commonwealth, and shall be escheated in the manner hereinafter provided, with interest actually accrued thereon to the date of the decree for the escheat of the same." (Italics supplied.)

Beyond doubt, Upper Main Line Bank is a "trustee" or "other depositary" in possession of the money "as a fiduciary agent" within the statutory requirement: Rogers, supra, at 59. The narrow question remaining

is whether the money is "without a rightful owner," or whether the "owner" or "person entitled" thereto is unknown. We have demonstrated that under the law intervenors as finders of lost property have a qualified legal ownership as against all the world except the true owner. Is the Commonwealth to be included in "all the world?" That question did not have to be, and was not, reached or decided in Rogers, supra, the court saying, at page 59: "Even had the Liebermans not disclaimed any right to the money as the finders, the question of law as to whether the facts established a finder's right in them to qualified ownership of the property would still be a matter for adjudication . . . in the escheat proceeding." No case we have found or been cited to has decided whether the right of a finder is that of an "owner," "rightful owner" or "person entitled" so as to prevent escheat. But, after careful consideration, we have concluded that it is.

Neither the Act of 1869 nor the Act of 1915 defines "owner," "rightful owner" of, or "person entitled" to such property. The common-law status of a finder as a qualified owner of lost property is, therefore, not disturbed. He remains for escheat purposes both a "rightful owner" and a "person entitled" to the property. Had the legislature intended to limit the meaning of those terms to the true, or original, owner, it knew how to and could have done so. In addition, the reason for and purpose of the escheat laws is not to deprive a lawful owner of his rights in property which he asserts timely. On the contrary, those statutes are based upon the theory that "by taking the property, the sovereign *harms no known person, and removes temptation of a possible dispute*": 64 Dickinson Law Rev. 331. (Italics in original.) To take the property of a claimant who has and asserts a lawful right even of qualified ownership runs counter to the purpose and intent of those acts.

True it is that under The Fiscal Code the property here in question would initially be paid into the State Treasury and be held subject to the claims of persons entitled thereto, made within seven years. But by its very reference to "money or property which are or shall be made escheatable by any act of the General Assembly" the code applies only to property as to which the "owner . . . or person entitled" to the property "shall be and remain unknown." Intervenors, as qualified owners of lost property, are in law "owners" or at least a "person entitled" to it as against all but the true owner. Consequently, since the money does not fall within the purview of the Act of 1869 or of the Act of 1915, as amended, it is not escheatable by statute, and, therefore, is not payable into the State Treasury under section 1310 of The Fiscal Code.

And now, July 9, 1965, the prayer of the petition is refused and the petition is dismissed.